**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THERESA BROUGHTON, Derivatively on Behalf of YRC WORLDWIDE, INC., <br><br> Plaintiff, <br><br> v. <br><br> DARREN D. HAWKINS, JAMES L. WELCH, JAMIE G. PIERSON, STEPHANIE D. FISHER, RAYMOND J. BROMARK, DOUGLAS A. CARTY, WILLIAM R. DAVIDSON, MATTHEW A. DOHENY, ROBERT L. FRIEDMAN, JAMES E. HOFFMAN, MICHAEL J. KNEELAND, PATRICIA M. NAZEMETZ, and JAMES F. WINESTOCK, <br><br> Defendants, <br><br> -and- <br><br> YRC WORLDWIDE, INC., <br><br> Nominal Defendant. | Civil Action No.: _____ <br><br><br><br> **DEMAND FOR JURY TRIAL** |

**<u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Theresa Broughton ("Plaintiff"), by and through her undersigned counsel, derivatively on behalf of nominal defendant YRC Worldwide, Inc. ("YRC" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of YRC for breaches of fiduciary duty, insider selling and misappropriation of information, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff bases her allegations on personal knowledge as to her own acts, and on information and belief as to all other allegations,

based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by YRC with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by YRC; (iii) a purported securities class action lawsuits filed in the United Stated District Court for the Northern District of New York against YRC and defendants James L. Welch ("Welch"), Jamie G. Pierson ("Pierson"), Stephanie D. Fisher ("Fisher"), and Darren D. Hawkins ("Hawkins"), entitled *Lewis v. YRC Worldwide, Inc.*, Case 1:19-cv-00001 (N.D.N.Y.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning YRC.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of YRC's officers and members of the Company's Board of Directors (the "Board"). Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws from March 10, 2014 through December 14, 2018 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to YRC and other damages.

2.      YRC provides transportation services through YRC Freight Inc. (YRC Freight) and Regional Transportation segments.  YRC Freight, was created through the merger of Roadway Express, Inc. ("Roadway") and Yellow Transportation, Inc. ("Yellow"). Until 2009, Roadway and Yellow were operated separately.  YRC Freight is YRC's largest subsidiary.

3.      YRC Freight concentrates on less-than-truckload ("LTL") freight shipping in which goods are transported from multiple shippers in a single trailer.  One of YRC's main customer groups include the U.S. government, including the U.S. Department of Defense.

4.      YRC charges its shipping customers based primarily on a shipment's weight and travel distance.  Customers weigh a shipment before it reaches YRC's terminals, but YRC

reweighs cargo that passes through its freight terminals.  Upon reweighing, if the weight of a customer's freight is heavier than the weight on the associated invoice or bill of lading, YRC will apply a positive reweigh correction and charge the customer for the additional weight.  On the other hand, if the shipment was lighter than the weight on the associated invoice or bill of lading, YRC is supposed to apply a negative reweigh correction and refund the excess charge.  The practice of cost-correcting for positive and negative reweighs is industry standard and has been for decades.

5.     Beginning at least in September 2005 through at least the end of the Relevant Period, the Company's executives implemented a fraudulent overcharging scheme by eliminating negative weigh corrections.  The fraudulent overcharging scheme increased YRC's revenue by $2 million per quarter.

6.     Due to YRC's fraudulent overcharging scheme, the U.S. Department of Justice (the "DOJ") served a civil investigative demand on YRC, which eventually led to the DOJ filing a complaint in intervention of a whistleblower action alleging violations of the False Claims Act (the "FCA").  As a result of YRC's fraudulent overcharging scheme, YRC faces hundreds of millions of dollars in civil penalties as well as damages imposed by the U.S. government.

7.     Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that:  (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with Generally Accepted Accounting Practices ("GAAP"); and (3) a DOJ Investigation had been initiated.

8.     During this time, certain of the Individual Defendants also issued a materially false and misleading proxy statements urging stockholders to reelect certain directors under false pretenses

9.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, YRC has sustained damages as described below.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

11.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because nominal defendant YRC is incorporated in this District.  In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

14.    Plaintiff is a current holder of YRC common stock and has held YRC common stock continuously since December 2008.

15.    Nominal Defendant YRC is a Delaware corporation with its principal executive offices at 10990 Roe Avenue, Overland Park, Kansas 66211.  YRC's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "YRCW."

16.    Defendant Hawkins has served as the Company's CEO and director of the Board since April 2018.  Defendant Hawkins previously served as the Company's Chief Operating

Officer ("COO") between January 2018 and April 2018 and the Company's President between February 2014 and April 2018.  Dawkins also served as the Company's Senior Vice President - Sales and Marketing from January 2013-February 2014.  Dawkins previously worked for Yellow in various positions of increasing responsibility from 1991-2009.  Defendant Hawkins is named as a defendant in the Securities Class Action.  During the Relevant Period, defendant Hawkins sold the following shares with insider information regarding YRC's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in YRC stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| November 11, 2014 | 2,241 | $23.56 | $52,807 |
| November 21, 2014 | 8,000 | $23.35 | $186,796 |
| February 13, 2015 | 1,571 | $19.87 | $31,216 |
| August 14, 2015 | 3,705 | $19.47 | $72,139 |
| November 6, 2015 | 5,000 | $17.49 | $87,425 |
| August 2, 2016 | 18,896 | $11.59 | $219,005 |
| February 23, 2017 | 7,500 | $12.50 | $93,750 |
| February 27, 2017 | 7,500 | $12.81 | $96,075 |

17.     Defendant Welch served as the Company's Chief Executive Officer ("CEO") between July 2011 and April 2018 and as a director of the Company's Board between July 2011 and July 2018.  Welch also worked with Yellow from 1978 to 2007, including as President and CEO from 2000 through 2007.  Defendant Welch is named as a defendant in the Securities Class Action.  In fiscal 2018, defendant Welch received $4,331,248 in compensation from the Company, which consisted of $525,000 in salary, $1,485,829 in stock awards, $2,237,813 in incentive payments, and $82,606 in other compensation.  During the Relevant Period, defendant Welch sold the following shares with insider information regarding YRC's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in YRC stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| November 14, 2014 | 10,000 | $23.75 | $237,500 |
| November 24, 2014 | 10,194 | $23.52 | $239,722 |
| November 25, 2014 | 10,000 | $23.80 | $238,050 |
| November 28, 2014 | 1,700 | $24.26 | $41,248 |
| December 1, 2014 | 8,300 | $24.01 | $199,249 |
| August 4, 2015 | 40,000 | $20.13 | $805,280 |
| August 6, 2015 | 41,107 | $20.08 | $825,469 |
| August 5, 2016 | 42,346 | $12.32 | $521,702 |
| August 31, 2016 | 19,918 | $11.61 | $231,247 |
| February 17, 2017 | 100,000 | $13.14 | $1,315,000 |
| November 10, 2017 | 50,000 | $12.16 | $608,000 |
| November 13, 2017 | 50,000 | $12.32 | $616,000 |

18.     Defendant Pierson served as the Company's Chief Financial Officer ("CFO") between November 2011 and December 2016 and as the Company's interim CFO from August 2011 to November 2011.  Defendant Pierson is named as a defendant in the Securities Class Action.   In fiscal 2016, defendant Pierson received $1,631,797 in compensation from the Company, which consisted of $612,000 in salary, $908,299 in stock awards, and $111,498 in other compensation.   During the Relevant Period, defendant Pierson sold the following shares with insider information regarding YRC's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in YRC stock trading at artificially inflated prices at the time of her stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| March 11, 2014 | 19,700 | $23.35 | $479,655 |
| November 20, 2014 | 10,596 | $22.47 | $238,123 |
| August 4, 2015 | 84,155 | $20.40 | $1,716,761 |
| August 12, 2016 | 49,000 | $11.28 | $552,720 |

19.     Defendant Fisher has served as the Company's CFO since May 2017.  Fisher worked in various other capacity at the Company since 2004, including as Director - Financial Reporting and various positions in the Company's Corporate Accounting department from 2004

to 2012 and as the Company's Vice President and Controller of YRC from May 2012 to May 2017. Defendant Fisher is named as a defendant in the Securities Class Action.  In fiscal 2018, defendant Fisher received $1,500,317 from the Company in compensation, which consisted of $400,000 in salary, $141,214 in stock awards, $930,000 in incentive payments, and $29,103 in other compensation.  Defendant Fisher sold the following shares with insider information regarding YRC's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in YRC stock trading at artificially inflated prices at the time of her stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| November 7, 2014 | 5,000 | $23.50 | $117,500 |

20.     Defendant Raymond J. Bromark ("Bromark") has served as a director of the Company's Board since July 2011.  Defendant Bromark also serves as the Chairman of the Company's Audit & Ethics Committee during the Relevant Period.  In fiscal 2018, defendant Bromark received $251,044 in compensation from the Company, which consisted of $130,000 in cash, $120,557 in stock awards, and $487 in other compensation.  During the Relevant Period, defendant Bromark sold the following shares with insider information regarding YRC's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in YRC stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| May 5, 2014 | 5,000 | $21.17 | $105,835 |

21.     Defendant Douglas A. Carty ("Carty") has served as a director of the Company's Board since July 2011.  Defendant Carty also served as a member of the Audit & Ethics Committee during the Relevant Period.  In fiscal 2018, defendant Carty received $226,044 in compensation from the Company, which consisted of $105,000 in cash, $120,557 in stock awards, and $487 in all other compensation.

22.     Defendant William R. Davidson ("Davidson") has served as a director of the Company's Board since July 2014.  Davidson previously spent nearly a quarter of a century working at the Company or its predecessors, including as an area vice president from 1985 through 2003 and as Corporate Vice President from 2003 to 2009.  In fiscal 2018, defendant Davidson received $196,044 in compensation from the Company, which consisted of $75,000 in cash, $120,557 in stock awards, and $487 in other compensation.  During the Relevant Period, defendant Davidson sold the following shares with insider information regarding YRC's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in YRC stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| February 21, 2017 | 3,800 | $13.11 | $49,818 |
| November 7, 2017 | 3,921 | $13.40 | $52,533 |

23.     Defendant Matthew A. Doheny ("Doheny") has served as a director of the Company's Board since July 2011.  During his tenure on the Board, Doheny also mounted several unsuccessful election bids for the U.S. House of Representatives.  During this time, according to reports filed with the U.S. Federal Election Commission (the "FEC"), Doheny received substantial campaign contributions from numerous YRC employees, including Hawkins, and Pierson, Welch, as well as other members of the Board, including defendants Bromark, Carty, Friedman, Hoffman, Kneeland, and Winestock.  In fiscal 2018, defendant Doheny received $196,044 in compensation from the Company, which consisted of $150,000 in cash, $120,557 in stock awards, and $487 in other compensation.

24.     Defendant Robert L. Friedman ("Friedman") has served as a director of the Company's Board since July 2011.  Defendant Friedman also served as a member of the Company's Audit & Ethics Committee.  In fiscal 2018, defendant Friedman received $226,044 in

compensation from the Company, which consisted of $105,000 in cash, $120,557 in stock awards, and $487 in other compensation.

25.     Defendant James E. Hoffman, ("Hoffman") has served as a director of the Company's Board since July 2011.  In fiscal 2018, defendant Hoffman received $306,044 in compensation from the Company, which consisted of $185,000 in cash, $120,557 in stock awards, and $487 in other compensation.

26.     Defendant Michael J. Kneeland ("Kneeland") has served as a director of the Company's Board since July 2011.  Defendant Kneeland served as a member of the Governance Committee during the Relevant Period.  In fiscal 2018, defendant Kneeland received $226,044 in compensation from the Company, which consisted of $105,000 in cash, $120,557 in stock awards, and $487 in other compensation.

27.     Defendant Patricia M. Nazemetz ("Nazemetz") has served as a director of the Company's Board since March 2015.  Defendant Nazemetz served as a member of the Governance Committee during the Relevant Period.  In fiscal 2018, defendant Nazemetz received $241,044 in compensation from the Company, which consisted of $120,000 in cash, $120,557 in stock awards, and $487 in all other compensation.

28.     Defendant James F. Winestock ("Winestock") has served as a director of the Company since July 2011.  Winestock is currently retired, but he worked from 1969 through 2009 in increasingly senior positions for United Parcel Service, Inc.  Defendant Winestock served as a member of the Governance Committee during the Relevant Period.  In fiscal 2018, defendant Winestock received $236,044 in compensation from the Company, which consisted of $115,000 in cash, $120,557 stock awards, and $487 in other compensation.

29.     Defendants Hawkins, Welch, Pierson, and Fisher are collectively referred to herein as the "Officer Defendants."

30.     Defendants Bromark, Carty, and Friedman are collectively referred to herein as the "Audit Committee Defendants."

31.     Defendant Kneeland, Nazemetz, and Winestock are collectively referred to herein as the "Governance Committee Defendants."

32.     Defendants Davidson, Carty, Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock are collectively referred to herein as the "Director Defendants."

33.     Defendants Hawkins, Welch, Pierson, Fisher, Bromark, and Davidson are collectively referred to herein as the "Insider Selling Defendants."

34.     Defendants Hawkins, Welch, Pierson, Fisher, Bromark, Carty, Davidson, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, and Winestock are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty

to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

38.     To discharge their duties, the officers and directors of YRC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of YRC were required to, among other things:

> a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;
>
> b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;
>
> d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

39.     The Company also maintains a Code of Business Conduct (the "Code").  The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of YRC and its subsidiaries.

40.     Pursuant to the Code:

Financial Records

21. Keeping Accurate Records

We rely on our financial records to produce reports to the Board, management, stakeholders, lenders, government agencies and the public.  These records must accurately reflect our assets, liabilities, financial condition and performance.

We must provide accurate and truthful information in all reports and records, including timekeeping records, trip logs, expense reports, business records, financial statements, and reports to lenders.  If you are part of our Finance or Accounting organization, you have a special duty to ensure that our financial disclosures are full, fair, accurate, timely and understandable.

Any expense reports we submit must accurately record the purpose, amount and all persons present.  False or intentionally misleading entries, and misclassification of expenses, are prohibited.

Any claims we make as employees (including workers' compensation and other employment related claims) must be accurate and complete and free of any false or misleading statements.

All transactions must be recorded with care and honesty, and be supported by adequate documentation to permit review and audit.

If you are unsure how to properly record a transaction, you should contact your supervisor.

Each person at the Company – not just those in Finance – has a role in making sure that money is appropriately spent, our financial records are complete and accurate and internal controls are honored.  To make sure that we get this right, the Company maintains a system of internal controls to reinforce our compliance with legal, accounting, tax and other regulatory requirements at every location in which we operate.  Stay in full compliance with our system of internal controls, and don't hesitate to contact our Legal Department or Finance if you have any questions.

We must never be involved in:

- Submitting false invoices or expense reports
- Forging or altering checks or misdirecting payments
- Unauthorized handling, or false or misleading reporting, of transactions
- Creating or manipulating financial information so as to artificially inflate, depress, distort or conceal financial results
- Intentionally misclassifying transactions between accounts, departments or accounting periods
- Failing to record transactions in the proper account or accounting period
- Keeping secret or special books, records or accounts
- Improperly overriding or working around our system of internal controls
- Improper or fraudulent interference with, coercion, manipulation or misleading of, internal or external auditors or the Audit & Ethics Committee

22. Transparency and Full Disclosure

Transparency and full disclosure of our financial condition, operating results and significant risks and events are critical to our integrity and required by law. They depend upon the validity, accuracy and completeness of the information upon which our accounts, records and financial statements are based and the effectiveness of our internal accounting and disclosure controls. If you are involved in preparing, processing or recording such information, you must take responsibility for its accuracy and integrity.

Our public communications, including filings with the SEC and communications with stakeholders, lenders and analysts, must be fair, accurate, timely, complete and understandable. If you are involved in our SEC reporting process, and especially if you are a senior officer in Finance or Accounting or a person with supervisory responsibilities for our public disclosure documents, you must act in furtherance of this requirement. In particular, you are required to be familiar and comply with all SEC disclosure rules and guidance and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about us, or knowingly making any misleading statements, in our public disclosures or otherwise.

If you have any of these responsibilities, you must strictly comply with all internal controls and procedures for preparing public disclosures.

Finance and Accounting employees must record, classify and summarize all transactions in accordance with our internal control procedures, GAAP, and applicable securities laws and regulations. We must never create, or encourage others to create, records that are intended to mislead others or conceal improper activity or adverse results.

23. Insider Trading

Trading in our securities (common stock or public notes), or the securities of our publicly-traded Customers, suppliers, Business Partners or Transaction Parties, while in possession of material, nonpublic information about them or us, or disclosing that information to others for trading purposes, is against the law and a violation of this Code. See our Securities Trading and Disclosure Policy for a definition of material, nonpublic information and the laws and policies governing trading in our and others' securities.  Any person failing to comply with our Securities Trading and Disclosure Policy or insider trading laws will be subject to disciplinary action, including termination of employment or other business relationship, and can also be subject to civil and criminal liability.

*        *        *

39. Working with Government Agencies

If your work involves government agencies or officials, you must be aware of, and comply with, unique laws and regulations governing your actions. Conduct that is acceptable in the private sector may result in harsh consequences such as fines, penalties, debarment, suspension from competing for government contracts, and even criminal penalties.

41.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.     The Company's Audit & Ethics Committee is specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit & Ethics Committee is governed by the Audit & Ethics Committee Charter (the "Audit Committee Charter").

43.     Pursuant to the Audit Committee Charter:

The Board of Directors (the "Board") of YRC Worldwide Inc. (the "Company") has established an Audit & Ethics Committee (the "Committee") in accordance with the Company's bylaws.  This Charter and the composition of this Committee shall comply with applicable laws and the rules or regulations of the NASDAQ Stock Market LLC ("NASDAQ") and the Securities and Exchange Commission ("SEC").  This Charter replaces and supersedes in its entirety all previous Charter of the Committee.

**Purpose**

The primary purposes of the Committee are to act on behalf of the Board to:

(1) Discharge the Board of its responsibilities relating to the accounting, auditing, reporting, and financial practices of the Company and its subsidiaries, except to the extent the Board must retain such responsibility under applicable law or NASDAQ rules;

(2) Oversee the accounting and financial reporting processes of the Company and its subsidiaries, including oversight of the integrity of the Company's financial statements, the Company's systems of internal control over financial reporting, including disclosure controls and procedures, and other internal controls, the qualifications and independence of the Company's auditors and the performance of the Company's internal audit function and independent registered public accounting firm; and

(3) Oversee the Company's compliance with legal and regulatory requirements.

*       *       *

**Responsibility and Authority**

(1) Subject to the Company's bylaws, the Committee shall have the responsibility and authority to act on behalf of the Board to do the following:  (1) Appoint (and recommend that the Board submit for stockholder ratification, if applicable), compensate, retain, and oversee the work of any independent registered public accounting firm that the Company engages for the purpose of preparing or issuing an audit report or performing other audit, review, or attestation services or other related work for the Company;

(2) Pre-approve all audit services and non-audit services that the Company's independent registered public accounting firm provides to the Company and the fees for such services, and review and approve the Company's policy on retention of the independent registered public accounting firm for any non-audit services.  In addition to the Committee, the Chair of the Committee is expressly authorized to pre-approve the provision of non-audit services to the Company by the Company's

independent registered public accounting firm, provided that any approval by the Chair of the Committee must be reported to the Committee at its next meeting.

(3) Evaluate and resolve any disagreements between the Company's management and the Company's independent registered public accounting firm regarding financial reporting;

(4) Establish procedures for the receipt, retention, and treatment of any complaints that the Company receives regarding accounting, internal accounting controls, or auditing matters and for the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

(5) Oversee the Company's risks relating to (i) accounting and financial reporting matters; and (ii) ethics and general compliance matters, and review the adequacy of the Company's overall control environment and controls in selected areas representing significant financial risk, and discuss with the Governance Committee key risk exposures and the steps management has taken to monitor and control such exposures;

(6) Meet periodically with the General Counsel, and outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company; and (ii) any matters involving potential or ongoing material violations of law by the Company or any of its directors, officers, employees, or agents or breaches of fiduciary duty to the Company by any directors, officers, employees, or agents;

(7) Recommend to the Board whether the annual audited financial statements should be included in the Company's Annual Reports on Form 10-K;

(8) Approve the Company's Quarterly Reports on Form 10-Q;

(9) Review the adequacy of the disclosures included in the Company's annual proxy statements and financial statements, including the related party transaction disclosures, among others;

(10) Review and approve the report from the Committee that the SEC requires to be included in the Company's annual proxy statement; and

(11) Perform such other responsibilities as may be determined by the Committee to be reasonably related to any of the foregoing or necessary or convenient to fulfill its purpose and responsibilities under this Charter or such other responsibilities as the Board may delegate to it from time to time.

**The Committee shall review and discuss with management and the independent registered public accounting firm, as appropriate, the following**:

(1) The annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and any other material financial information submitted to the SEC, including any certification, report, opinion, or review rendered by the independent registered public accounting firm, prior to the filing thereof;

(2) Earnings press releases, including any pro forma or adjusted non-GAAP information contained therein, which discussion may be general and need not occur in advance of each earnings release;

(3) The type and presentation of financial information and earnings guidance provided to analysts and rating agencies;

(4) Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy and effectiveness of the Company's system of internal controls and any special audit steps adopted in response to material control deficiencies;

(5) Analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of financial statements, including analysis of the effects of alternative GAAP methods on the financial statements;

(6) Any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding the Company's financial statements or accounting policies;

(7) The effect of regulatory changes, significant new or proposed accounting standards, and off-balance sheet structures on the Company's financial statements;

(8) Key financial statement issues and risks, their impact or potential effect on reported financial information, the process used by management to address such matters, and the views of the related independent registered public accounting firm, and the basis for its audit conclusions.  Important conclusions on interim or year-end audit work in advance of the public release of the Company's financial statements; and

(9) The recommendations of the internal auditor and independent registered public accounting firm on financial reporting, internal controls, and other related matters, and management's response thereto, and the views of management, the internal auditor, and the independent registered public accounting firm on the overall quality of annual and interim financial reporting.

*     *     *

Oversight of the Company's Internal Audit Function

(1) The Committee shall review and discuss with management the internal audit function of the Company including the independence from management, the annual internal audit plan for the coming year, the process used to develop the plan, the status of internal audit activities, including any significant findings, recommendations, and management's response.

(2) The Committee shall review and discuss with the independent registered public accounting firm the responsibilities, budget and staffing levels of the Company's internal audit function.

(3) The Committee shall review and approve internal audit projects and annual budget, the internal audit charter and changes in internal audit leadership.

(4) The Committee shall meet periodically with the internal audit staff and review the status and results (including remedial actions) of audit projects.

44.     In violation of the Audit Committee Charter, and their general duties as members of the Audit & Ethics Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

45.     Further, the Company's Governance Committee is specifically tasked with the Board's oversight responsibilities.  The conduct of the Governance Committee is governed by the Governance Committee Charter (the "Governance Committee Charter").

46.     Pursuant to the Governance Committee Charter:

**Purpose**

The primary purposes of the Committee are to discharge the Board's responsibilities, and to act on behalf of the Board, with regard to the following:

(1) Identify and assess persons qualified to become Board members, consistent with the qualification standards and criteria approved by the Board;

(2) Recommend for approval to the Board the structure and membership of Board committees;

(3) Recommend for approval to the Board the slate of director candidates to be nominated for election at the annual meeting of stockholders (other than those directors appointed by holder of the share of Series A Preferred Stock of the Company, if applicable);

(4) Recommend for approval to the Board and oversee a set of guidelines on corporate governance (the "Guidelines on Corporate Governance") applicable to the Company and make other recommendations for approval to the Board relative to corporate governance issues;

(5) Assist the Board in assessing director independence;

(6) Review and, if appropriate, recommend for approval to the Board, all related-party transactions;

(7) Manage the Board education process;

(8) Oversee new Board member orientation;

(9) Oversee annual evaluations of the Board and committees of the Board; and

(10) Provide oversight for the Company's enterprise risk management process.

*     *     *

**Responsibilities and Authority**

Subject to the Company's bylaws, the Committee shall have the responsibility and authority to act on behalf of the Board to do the following:

A. Develop the qualification standards and criteria for the requisite skills and characteristics of new Board members, as well as composition of the Board as a whole and its committees.  The Committee shall periodically review and, if desirable, recommend for approval changes to the qualification standards and criteria for the selection of new directors as adopted by the Board from time to time and as set forth in the Company's Guidelines on Corporate Governance;

B. As appropriate, actively seek individuals qualified to become board members for recommendation to the Board; review and recommend for Board approval the

criteria for the selection of nominees for election as directors of the Company and review the qualifications of all candidates, including those proposed by stockholders in accordance with notice provisions and procedures in the bylaws of the Company (other than those appointed by the holder of the share of Series A Preferred Stock, if applicable);

C. Evaluate and make recommendations for approval to the Board regarding stockholder proposals;

D. Recommend for approval to the Board director nominees to be proposed for election at the annual meeting of stockholders or to be elected or appointed by the Board to fill vacancies or newly-created directorships (subject to the rights of the holder of the share of Series A Preferred Stock of the Company, if applicable);

E. As appropriate, review and recommend for approval to the Board changes to the notice provisions and procedures as set forth in the Company's bylaws for the submission of recommendations by stockholders for nominees for election as directors of the Company;

F. Review and, if appropriate, recommend for approval to the Board, all related-party transactions for potential conflict of interest situations on an ongoing basis, in accordance with the Company's Related Party Transaction Policy;

G. Review any potential conflicts that may arise due to a potential appointment of any Board member on the board of another company and approve such appointment, as appropriate;

H. Annually review the Director Independence Standards of YRC Worldwide Inc. and recommend for Board approval any proposed changes for those standards for determining whether or not a director is "independent;"

I. In accordance with the Director Independence Standards, the NASDAQ rules or regulations and applicable law, assess and make recommendations to the Board with respect to each Board member's independence;

J. Monitor the mix of skills and experience of its directors and committee members in order to assess whether the Board has the appropriate tools to perform its oversight function effectively;

K. Lead the Board's annual self-evaluation process and review and make recommendations as to the effectiveness and performance of the Board as a whole, which shall be discussed with the full Board;

L. Oversee the annual performance evaluations of the Board's committees, including this Committee, and present the evaluations to the Board;

M. Review with the Chief Executive Officer management development and succession planning;

N. Administer and annually review and reassess the adequacy of the Guidelines on Corporate Governance of the Company and recommend any proposed changes to the Board for approval;

O. From time to time, review the Code of Business Conduct, the Foreign Corrupt Practices Act Policy, the Related Party Transaction Policy, and the Securities Trading and Disclosure Policy and approve any changes thereto;

P. Make recommendations to the Board for approval as to changes in corporate governance from time to time that the Governance Committee finds are necessary or otherwise in the best interests of the Company, including changes to the Company's certificate of incorporation and bylaws;

Q. Annually review all Board committees' structures, and if desirable, recommend to the Board for approval changes in their number, responsibilities and membership to ensure that they reflect a commitment to effective governance, and recommend that the Board establish any special committees as necessary to properly address ethical, legal or other matters that may arise from time to time;

R. Make recommendations to the Board for approval regarding the membership of the Board committees (subject to the rights of the holder of the share of Series A Preferred Stock of the Company, if applicable), giving consideration to the criteria for service on each committee as set forth in the charter for such committee, as well as to any other factors the Committee deems relevant, and the respective responsibilities of each Board committee;

S. Provide oversight for the Company's enterprise risk management function, discuss with the Audit & Ethics Committee the Company's accounting and financial reporting risk profile, and discuss with management their systems and processes for the identification, assessment, and management of material risk exposures, including:

- management's risk assessment and risk management approach, policies, systems and practices;
- management's risk appetite and strategies related to key exposures; and
- the disclosures on risk assessment and management in the Company's proxy statement and periodic reports; and

T. Perform such other responsibilities as may be determined by the Committee to be reasonably related to any of the foregoing or necessary or convenient to fulfill its responsibilities under this Charter or such other responsibilities as the Board may delegate to it from time to time.

47.     In violation of the Governance Committee Charter, and their general duties as members of the Governance Committee, the Governance Committee Defendants conducted little, if any, oversight of the Company's enterprise risk management process, resulting in the Company engaging in fraudulent overbilling scheme.

48.     In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing YRC to make false and misleading statements of material fact about the Company's financials and about YRC's maintenance of adequate internal controls.

49.     Each of the Individual Defendants further owed to YRC and its stockholders the duty of loyalty requiring that each favor YRC's interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

50.     YRC is a transportation company that operates through its subsidiaries in the two reporting segments:  (1) YRC Freight, which focuses on long haul business opportunities with

regional, national, and international services; and (2) Regional Transportation, which focuses on business opportunities in the regional and next-day delivery markets.

51.     The YRC Freight segment was created when Yellow purchased Roadway for $955 million in cash and stock in 2003.  For several years after the merger, however, Yellow and Roadway continued to operate separately with distinct corporate structures.  In 2009, Yellow and Roadway officially merged to become YRC, Inc., which subsequently became YRC Freight, Inc. due to a name change.  The YRC Freight segment approximately represents two-thirds of YRC's revenue.

52.     YRC sought business from the U.S. government, and the business from the U.S. government was material to YRC's operational and financial results.  Indeed, YRC solicits U.S. government agencies' business on its website, which states that YRC serves "the United States government and provides dedicated personnel who work exclusively to create and manage transportation and logistics solutions that meet the needs of departments and agencies in the U.S. government."

53.     The way freight carriers at YRC Freight, Yellow, and Roadway operated is as follows:  (1) pick up shipments at its origination, (2) transport the shipments to the carrier's terminal, and (3) load the shipments for delivery to the final destination.  Throughout this process, each shipment was accompanied by a bill of lading, an agreement between the customer and the carrier that documents key information about the shipment, including the shipment's weight and distance to the destination.

54.     YRC Freight, Yellow, and Roadway determined the applicable rate and final fee for freight services based on a shipment's weight and distance traveled.

23

55.     While shipments were at a freight carrier's terminal or warehouse, the carrier often verifies the information included on the shipment's bill of lading by reweighing the shipment. During the verification process, the carriers made positive and negative reweigh corrections based on the actual weight of the shipment.  Positive reweigh corrections, where the revised shipment weight was heavier than the original weight, typically increased the cost of the shipment, and thus YRC Freight, Yellow, and Roadway's revenue.  On the other hand, negative reweigh corrections typically decreased the cost of the shipment.

56.     YRC Freight, Yellow, and Roadway knew that accurate reweighing was important. In October 2004, an internal Yellow email noted that false positive reweigh corrections, thus overcharging the clients, "creates an integrity problem for Yellow and every affected customer." Yellow's internal email in May 2005 also indicated that making negative reweigh corrections was vital to its credibility by stating that employees should do "the right thing by [making] a negative revenue correction."

**YRC ELIMINATES NEGATIVE REWEIGH CORRECTIONS**

57.     In August 2005, Roadway automatized its reweigh procedures using new scales and wireless tracking devices, which "capture[d] all positive and negative weight corrections regardless of the weight difference."  Within less than a month, the automatic reweigh procedure increased Roadway's revenue.  On September 1, 2005, Keith Rawson ("Rawson"), then a high-level employee at Yellow Roadway Enterprise Services, which oversaw the integration between Roadway and Yellow following the merger, observed that negative corrections were resulting in paying the customers back.  Rawson reported that Roadway had begun "analyzing limits on negative reweighs," and noted that getting rid of negative reweigh corrections could allow Roadway and Yellow to keep a combined $2 million per month.

58.     Soon after, on September 13, 2005, Roadway essentially eliminated negative reweigh corrections.  On October 3, 2005, Dean Frye ("Frye"), a senior employee at Roadway, sent a widely distributed internal email informing that Roadway "emliminate[d] the automated issuance of negative weight corrections," which resulted in "[n]egative weight corrections will no longer be [made]."

59.     After reprogramming the automatic reweigh procedure to exclude negative reweigh corrections, Roadway also instructed its freight handlers, weight coordinators, and inspectors to stop manually making negative reweigh corrections with a few exceptions.  Eliminating negative reweigh corrections was projected to save Roadway $1 to $1.5 million in revenue per month.

60.     On September 19, 2005, Rawson suggested that Yellow could also follow Roadway's footsteps and eliminate negative reweigh corrections.  On September 26, 2005, Joe Whitsel ("Whitsel"), a senior employee at Yellow Roadway Enterprises Services responded to Rawson that Yellow should eliminate negative reweigh corrections as well to meet the "synergy goal for the year."   Rawson sent another email regarding negative reweigh corrections on September 29, 2005, pointing out that Yellow would "retain approximately $6 million per year ($500k per month)" from eliminating negative reweigh corrections.   Yellow's Senior Vice President for Finance & Administration replied that he would discuss with Yellow's then-President, Defendant Welch.

61.     On October 3, 2005, Whitsel told Mike Smid ("Smid"), Roadway's President and CEO, that he was recommending that "Yellow follow roadway's lead and implement the elimination of the negative revenue adjustments."   Smid expressed concern with a complete elimination but said that there was "a right number in order to give our [reweigh] program some credibility."

62.     On October 13, 2005, Rawson shares his analyses as to what the "right number" would be and presented a few alternatives to Whitsel.  Rawson noted that some of the alternatives would raise questions from the customers and recommended that "if we are going to do it, let's go all the way."

63.     In the same month, Hugh Gaynor, a Revenue Management executive at Yellow, indicated concerns regarding eliminating negative reweigh corrections.  While at an industry meeting, other freight companies indicated that "not [making negative reweigh corrections] was a breach of faith with their customers and undermined the integrity of the program."  Despite this information, on November 2, 2005, Whitsel reported to another Yellow Roadway Enterprise Services that, aside from Roadway, only two other freight companies were not "entering negative weight corrections."  Ultimately, Yellow's executive leadership decided to copy Roadway and eliminate negative reweigh corrections on or around February 27, 2006.  Yellow's revenues began rising rapidly after the elimination of negative reweigh corrections.  Between November 13, 2006 and January 20, 2007, Yellow made 42 negative reweigh corrections out of 1.5 million invoices.  In the same period, Yellow made 75,324 positive reweigh corrections out of 1.5 million invoices.

64.     The elimination of negative reweigh corrections continued at YRC Freight, Yellow, and Roadway until at least October 2013, resulting in overcharging the customers, including the U.S. Department of Defense.

**YRC's Fraudulent Billing Scheme Cheated the U.S. Government and U.S. Taxpayers in Violation of the FCA**

65.     In 2008, James Hannum ("Hannum"), who had worked for Roadway over 30 years at its Buffalo, New York facility, filed a whistleblower action under the Federal Civil False Claims Act ("FCA"), which establishes liability for overcharging the U.S. government.  The FCA provides for a recovery of three times the damages sustained by the U.S. government, plus a civil penalty

for each violation of the Act.  The civil penalty for an FCA violation is to be not less than $5,500 and not more than $11,000.

66.     Hannum's complaint shed light on YRC's elimination of negative reweigh corrections.  According to Hannum, from about 2004 to 2008, Roadway had been processing its weight corrections solely to increase the amount invoiced when the actual scale weight exceeded the stated weight on the bill of lading.  Nevertheless, Roadway prohibited its computer system from decreasing the amount invoiced when the actual scale weight was less than that stated on the bill of lading.

67.     In or around 2009, the U.S. Department of Justice (the "DOJ") began investigating YRC's billing fraud.  In connection with its investigation, the DOJ issued a civil investigative demand to YRC regarding its billing practices, which resulted in the DOJ interviewing at least 32 witnesses and reviewing "hundreds of thousands of pages" of documents produced by YRC.

68.     After a lengthy investigation, the DOJ intervened in Hannum's whistleblower action and filed its complaint against YRC on December 14, 2018.  In its complaint, the DOJ alleged that YRC Freight, Yellow, and Roadway knowingly submitted thousands of claims to the U.S. Department of Defense by inflating weights to overcharge the U.S. government.  Further, YRC Freight, Yellow, and Roadway appears to have concealed evidence of their overcharging fraud, demonstrated by their lack of record of negative reweigh corrections between September 2005 and June 2010.

69.     YRC Freight, Yellow, and Roadway also made false and misleading statements to the U.S. Department of Defense to win contracts.  Indeed, contracts between the U.S. Department of Defense and Roadway and Yellow required the companies "to immediately notify the Contracting Officer and request instructions for disposition of the overpayment."  Instead, YRC

Freight, Yellow, and Roadway concealed evidence of their misconduct by programming their computer system so that negative reweigh results would not register.  For example, according to an internal email sent on June 26, 2009, YRC Freight programmed its computer system so that negative reweigh results would "never show up in the mainframe . . . to be recorded."  Negative reweigh results were rejected with the reason as "CAN NOT [sic] FIND EMPLOYEE NUMBER" despite the fact that YRC actually had an error code "NEGATIVE WEIGHT CORRECTION PROHIBITED" in the system.

70.     After the DOJ's civil investigative demand, YRC Freight, Yellow, and Roadway retained records of their negative reweigh corrections.  Between June 2010 and October 2012, the DOJ noted that there were more than 13,000 false claims during the period, an average of 725 false claims per month.  Based on these numbers, it is estimated that YRC Freight, Yellow, and Roadway submitted approximately 70,000 false claims between September 2005 and October 2013 to the U.S. Department of Defense.

71.     Based on FCA's civil penalty provision alone, YRC is subject to a civil penalty of approximately $385 to $770 million, in addition to treble damages sustained by the U.S. government.

**YRC'S FALSE AND MISLEADING STATEMENTS**

72.     During the Relevant Period, the Individual Defendants caused YRC to file Forms 10-Q and 10-K with the SEC failed omitted material information relating to YRC's overbilling fraud, including:  (1) that YRC was engaged in an overcharging fraud; (2) the DOJ's investigation, which exposed the Company to hundreds of millions of dollars in liability for FCA violations; and (3) that YRC's overcharging fraud subjected it to numerous undisclosed risks, including monetary risks and reputational risks.

28

73.     YRC was required to disclose the above information because, among other things: (1) material events and uncertainties known to YRC management that would cause YRC's reported financial information not to be necessarily indicative of the Company's future operating results or of future financial condition; (2) known trends or uncertainties that have had or that YRC reasonably expected will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations; and (3) unusual transactions or significant economic changes that were materially affecting the amount of reported operating and net income from YRC's continuing operations.

74.     Additionally, the Individual Defendants were required to make sure that the Company's financial statements complied with GAAP.  During the Relevant Period, the Company overstated its revenue through its overcharging fraud, which generated around $24 million per year in additional revenue.  By inflating the Company's reported revenue by $24 million per year through the overcharging fraud, the Individual Defendants caused the Company to overstate its operating income and net income for each quarter and year end during the Relevant Period.

75.     Although they had responsibility for establishing and maintaining adequate internal control over financial reporting, the Individual Defendants failed to establish sound internal control over the Company's financial reporting.  The Individual Defendants knew, or at least recklessly disregarded, that the Company's controls were materially deficient and that the material defects caused the Company's financial statements to be materially false and misleading during the Relevant Period.

**A. YRC's Materially False and Misleading Statements in the 2013 10-K**

76.     On March 10, 2014, the Individual Defendants caused the Company to file Form 10-K with the SEC (the "2013 10-K"), which made materially false and misleading statements and omitted material information.

77.     The 2013 10-K disclosed that the Company reported operating revenue of $4.865 billion, operating income of $28.4 million, and a net loss of $83.6 million.  For 4Q2013, the Company reported operating revenue of $1.2 billion, an operating loss of $1.6 million, and net income of $400,000.

78.     The financial figures were materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $24 million and operating income was overstated by $24 million.  For 4Q2013, the Company's operating revenue was overstated by $6 million and operating loss was understated by $6 million.

79.     The 2013 10-K represented that:

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating. . . .

*Revenue Recognition*

The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating.

80.     The above representations are materially false and misleading because the Individual Defendants failed to disclose that the Company's system blocked negative reweigh corrections and overcharged the Company's customers.  Additionally, the statement regarding

"revenue earned" is materially false and misleading because the Company recorded at least $6 million per quarter in operating revenue from the overcharging fraud.

81.     Regarding Company's policy and procedures for correcting incorrect customer prices, the 2013 10-K states:

> *Rerate Reserves*
>
> At various points throughout our customer invoicing process, incorrect ratings (i.e. prices) could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods.  We accrue a reserve for rerating based on historical trends.  At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively. . . .
>
> *Revenue Recognition*. . . .
>
> At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods.  At December 31, 2013 and 2012, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $9.6 million and $11.9 million, respectively.

82.     The above representation regarding the Company's rerating its customers' freight through "weight verifications" was materially false and misleading because the Individual Defendants failed to disclose that the Company was engaged in an overcharging fraud through reweighing.  When the customers were entitled to a refund or credit, the Company's system blocked negative reweigh corrections.  The Individual Defendants' failure to price the Company's customers' freight based on actual weights caused the "rerate reserve" to be materially understated in violation of GAAP.

83.     As to capturing, recording, and controlling information of the Company's revenue reserves, the 2013 10-K stated:

Revenue Reserves . . . We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

84.     This statement is materially false and misleading because the Individual Defendants failed to disclose that the Company's system for recording information necessary to manage the Company's revenue reserves did not "accurately record and control all relevant information necessary" because the Company's system did not refund or credit its customers due to the Company's overcharging fraud detailed above.

85.     Defendants Welch and Pierson, specifically, signed the SOX Certifications in the 2013 10-K and represented that:

(1)     I have reviewed this report on Form 10-K of YRC Worldwide Inc.;

(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(4)     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and

15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.   Any fraud, whether or not material, that involves

> management or other employees who have a significant
> role in the registrant's internal control over financial
> reporting.

86.     Defendants Welch's and Pierson's representation that the Company has adequate

internal control over financial reporting was materially false and misleading because Defendants

Welch and Pierson failed to disclose that the Company executives designed a system that blocked

negative reweigh corrections and overcharging its customers, which resulted in approximately $6

million illicit revenue per quarter in violation of GAAP.

87.     As to legal proceedings, claims, and other litigation that the Company was involved

in, the 2013 10-K stated:

> Litigation may be related to labor and employment, competitive matters,
> property damage and liability claims, safety and contract compliance,
> environmental liability, our past financial restructurings and other matters. . .
> Litigation can be expensive, lengthy and disruptive to normal business
> operations, including to our management due to the increased time and
> resources required to respond to and address the litigation.  The results of
> complex legal proceedings are often uncertain and difficult to predict.  An
> unfavorable outcome of any particular matter or any future legal proceedings
> could have a material adverse effect on our business, financial condition,
> liquidity or results of operations.  In the future, we could incur judgments or
> enter into settlements of claims that could harm our financial position, liquidity
> and results of operations. . .
>
> We are involved in other litigation or proceedings that arise in ordinary business
> activities.  We insure against these risks to the extent we deem prudent, but no
> assurance can be given that the nature or amount of such insurance will be
> sufficient to fully indemnify us against liabilities arising out of pending and
> future legal proceedings.  Many of these insurance policies contain self-insured
> retentions in amounts we deem prudent.  Based on our current assessment of
> information available as of the date of these financial statements, we believe
> that our financial statements include adequate provisions for estimated costs and
> losses that may be incurred within the litigation and proceedings to which we
> are a party.

88.     The above representations were materially false and misleading because the

Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging

fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

89.     The 2013 10-K appended two material contracts:   (1) credit agreement dated February 13, 2014 between the Company and Credit Suisse AG and (2) loan and security agreement, dated February 13, 2014 among YRC, RBS Citizens Business Capital, Merrill Lynch, and CIT Finance LLC.

90.     Both contracts included that YRC was "in compliance with all Laws.  This was materially false and misleading because the Company had been engaged in an overcharging fraud of the government in violation of the FCA.

**B. YRC's Materially False and Misleading Statements in the 1Q2014 10-Q**

91.     On May 1, 2014, the Individual Defendants caused the Company to file a Form 10-Q for 2Q 2014 (the "1Q2014 10-Q").  The Company reported operating revenue for the first quarter of 2014 of $1.211 billion, a consolidated operating loss reported of $32.4 million, and a net loss of 70.2 million.  The financial metrics disclosed in the 1Q2014 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

92.     The 1Q2014 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

93.     As to legal proceedings, claims, and other litigation that the Company was involved

in, the 1Q2014 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business
> activities.  We insure against these risks to the extent we deem prudent, but no
> assurance can be given that the nature or amount of such insurance will be
> sufficient to fully indemnify us against liabilities arising out of pending and
> future legal proceedings.  Many of these insurance policies contain self-insured
> retentions in amounts we deem prudent.  Based on our current assessment of
> information available as of the date of these financial statements, we believe
> that our financial statements include adequate provisions for estimated costs and
> losses that may be incurred within the litigation and proceedings to which we
> are a party.

94.     The above representations were materially false and misleading because the

Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging

fraud which began in 2009, which gave investors false impression that the Company did not face

substantial liability for violations of the FCA.

**C. YRC's Materially False and Misleading Statements in the 2Q2014 10-Q**

95.     On July 31, 2014, the Individual Defendants caused the Company to file a Form

10-Q for 2Q 2014 (the "2Q2014 10-Q").  The Company reported consolidated operating revenue

for the second quarter of 2014 of $1.318 billion, consolidated operating income of $20.0 million,

and a net loss of $4.9 million.  The financial metrics disclosed in the 2Q2014 10-Q were materially

false and misleading because the Company's operating revenue was overstated by $6 million from

the Company's overcharging fraud in violation of GAAP.

96.     The 2Q2014 10-Q included Sox Certifications signed by Defendants Welch and

Pierson that contained representations substantially similar to the representations contained in the

2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate

internal control over financial reporting was materially false and misleading because Defendants

Welch and Pierson failed to disclose that the Company executives designed a system that blocked

36

negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

97.     As to legal proceedings, claims, and other litigation that the Company was involved in, the 2Q2014 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

98.     The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

### D. YRC's Materially False and Misleading Statements in the 3Q2014 10-Q

99.     On October 30, 2014, the Individual Defendants caused the Company to file a Form 10-Q for 3Q 2014 (the "3Q2014 10-Q"). The Company reported consolidated operating revenue for the third quarter of 2014 of $1.323 billion, consolidated operating income increased of $26.7 million, and net income of $1.2 million. The financial metrics disclosed in the 3Q2014 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

100.    The 3Q2014 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K. Defendants Welch's and Pierson's representation that the Company has adequate

internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

101.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 3Q2014 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

102.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

103.    In addition, in connection with the 3Q 2014 10-Q, the Company released a press release on October 30, 2014, which stated, "Executing on our strategy of improving price and managing our freight mix to ensure that we have the right freight at the right price will continue to be a priority. . . ."  This statement was materially false and misleading because the Company failed to disclose that the Company's pricing strategy, in part, was to defraud its customers and government by overcharging for their freight.

**E. YRC's Materially False and Misleading Statements in the 2014 10-K**

104.    On February 20, 2015, the Individual Defendants caused the Company to file Form 10-K with the SEC (the "2014 10-K"), which made materially false and misleading statements and omitted material information.

105.    The 2014 10-K disclosed that the Company reported consolidated operating revenue for the year ended December 31, 2014 of $5.069 billion, consolidated operating income $45.5 million, and anet loss of $67.7 million.

106.    The financial figures materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million.  For 4Q2014, the Company's operating revenue was overstated by $6 million and its operating loss was understated by $6 million.

107.    The 2014 10-K represented that:

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating. . . .

*Revenue Recognition*

The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating.

108.    The above representations are materially false and misleading because the Individual Defendants failed to disclose that the Company's system blocked negative reweigh corrections and overcharged the Company's customers.  Additionally, the statement regarding

"revenue earned" is materially false and misleading because the Company recorded at least $6 million per quarter in operating revenue from the overcharging fraud.

109.    Regarding Company's policy and procedures for correcting incorrect customer prices, the 2014 10-K states:

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends.   At December 31, 2014 and 2013, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $12.2 million and $9.6 million, respectively. . . .

*Revenue Recognition*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.   This process is referred to as rating.   At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts.   Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods.  We accrue a reserve for rerating based primarily on historical trends.  At December 31, 2014 and 2013, our financial  statements included a rerate reserve as a reduction to "Accounts Receivable" of $12.2 million and $9.6 million, respectively.

110.    The above representation regarding the Company's rerating its customers' freight through "weight verifications" was materially false and misleading because the Individual Defendants failed to disclose that the Company was engaged in an overcharging fraud through reweighing.   When the customers were entitled to a refund or credit, the Company's system blocked negative reweigh corrections.  The Individual Defendants' failure to price the Company's customers' freight based on actual weights caused the "rerate reserve" to be materially understated in violation of GAAP.

111.    As to capturing, recording, and controlling information of the Company's revenue reserves, the 2014 10-K stated:

> Revenue Reserves . . . We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

112.    This statement is materially false and misleading because the Individual Defendants failed to disclose that the Company's system for recording information necessary to manage the Company's revenue reserves did not "accurately record and control all relevant information necessary" because the Company's system did not refund or credit its customers due to the Company's overcharging fraud detailed above.

113.    The 2014 10-K included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.   Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

114.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 2014 10-K stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

115.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**F. YRC's Materially False and Misleading Statements in the 1Q2015 10-Q**

116.    On April 30, 2015, the Individual Defendants caused the Company to file a Form 10-Q for 1Q 2015 (the "1Q2015 10-Q").  The Company reported consolidated operating revenue for the first quarter of 2015 of $1.186 billion, consolidated operating income reported of $3.7 million, and a net loss of $21.6 million.  The financial metrics disclosed in the 1Q2015 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

117.    The 1Q2015 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

118.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 1Q2015 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business
> activities.  When possible, we insure against these risks to the extent we deem
> prudent, but no assurance can be given that the nature or amount of such
> insurance will be sufficient to fully indemnify us against liabilities arising out of
> pending and future legal proceedings.  Many of these insurance policies contain

self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

119.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**G. YRC's Materially False and Misleading Statements in the 2Q2015 10-Q**

120.    On July 30, 2015, the Individual Defendants caused the Company to file a Form 10-Q for 2Q 2015 (the "2Q2015 10-Q").  The Company reported consolidated operating revenue for the second quarter of 2015 of $1.258 billion, operating income of $56.9 million, and net income of $26 million.  The financial metrics disclosed in the 2Q2015 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

121.    The 2Q2015 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

122.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 2Q2015 10-Q stated:

We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

123.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**H. YRC's Materially False and Misleading Statements in the 3Q2015 10-Q**

124.    On October 29, 2015, the Individual Defendants caused the Company to file a Form 10-Q for 3Q 2015 (the "3Q2015 10-Q").  The Company reported consolidated operating revenue for the third quarter of 2015 of $1.245 billion, consolidated operating income of $47.7 million, and net income of $19.8 million.  The financial metrics disclosed in the 3Q2015 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

125.    The 3Q2015 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

126.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 3Q2015 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

127.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**I. YRC's Materially False and Misleading Statements in the 2015 10-K**

128.    On February 18, 2016, the Individual Defendants caused the Company to file Form 10-K with the SEC (the "2015 10-K"), which made materially false and misleading statements and omitted material information.

129.    The 2015 10-K disclosed that the Company reported consolidated operating revenue for the year ended December 31, 2015 of $4.832 billion, consolidated operating income of $93 million, and net income of $700,000.

130.    The financial figures materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million.  For 4Q2014, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million.

131.    The 2014 10-K represented that:

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating. . . .

*Revenue Recognition*

The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating.

132.     The above representations are materially false and misleading because the Individual Defendants failed to disclose that the Company's system blocked negative reweigh corrections and overcharged the Company's customers.  Additionally, the statement regarding "revenue earned" is materially false and misleading because the Company recorded at least $6 million per quarter in operating revenue from the overcharging fraud.

133.     Regarding the Company's policy and procedures for correcting incorrect customer prices, the 2015 10-K stated:

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends. At December 31, 2015 and 2014, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.1 million and $12.2 million, respectively. . . . .

*Revenue Recognition*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating.  At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs

during the following periods.  We accrue a reserve for rerating based primarily on historical trends.  At December 31, 2015 and 2014, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.1 million and $12.2 million, respectively.

134.   The above representation regarding the Company's rerating its customers' freight through "weight verifications" was materially false and misleading because the Individual Defendants failed to disclose that the Company was engaged in an overcharging fraud through reweighing.  When the customers were entitled to a refund or credit, the Company's system blocked negative reweigh corrections.  The Individual Defendants' failure to price the Company's customers' freight based on actual weights caused the "rerate reserve" to be materially understated in violation of GAAP.

135.   As to capturing, recording, and controlling information of the Company's revenue reserves, the 2015 10-K stated:

***Revenue Recognition and Revenue-related Reserves***

We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

136.   This statement is materially false and misleading because the Individual Defendants failed to disclose that the Company's system for recording information necessary to manage the Company's revenue reserves did not "accurately record and control all relevant information necessary" because the Company's system did not refund or credit its customers due to the Company's overcharging fraud detailed above.

137.   The 2015 10-K included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants

Welch and Pierson failed to disclose that the Company executives designed a system that blocked

negative reweigh corrections and overcharging its customers, which resulted in approximately $6

million illicit revenue per quarter in violation of GAAP.

138.     As to legal proceedings, claims, and other litigation that the Company was involved

in, the 2015 10-K stated:

> We are involved in other litigation or proceedings that arise in ordinary business
> activities.  When possible, we insure against these risks to the extent we deem
> prudent, but no assurance can be given that the nature or amount of such insurance
> will be sufficient to fully indemnify us against liabilities arising out of pending and
> future legal proceedings.  Many of these insurance policies contain self-insured
> retentions in amounts we deem prudent.  Based on our current assessment of
> information available as of the date of these financial statements, we believe that
> our financial statements include adequate provisions for estimated costs and losses
> that may be incurred within the litigation and proceedings to which we are a party.

139.     The above representations were materially false and misleading because the

Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging

fraud which began in 2009, which gave investors false impression that the Company did not face

substantial liability for violations of the FCA.

**J. Defendant Welch's Message to Shareholders in Connection with the 2015 10-K**

140.     In connection with the 2015 10-K, the Company posted a message on its website

signed by defendant Welch, in which he stated, "Staying committed to our strategy was a key

driver in improving Adjusted EBITDA by almost $90 million to $333 million. . . ." This statement

was materially false and misleading because he failed to disclose that the Company's strategy was

overcharging its customers by eliminating negative reweigh corrections.

**K. YRC's Materially False and Misleading Statements in the 1Q2016 10-Q**

141.     On April 28, 2016, the Individual Defendants caused the Company to file a Form

10-Q for 1Q 2016 (the "1Q2016 10-Q").  The Company reported consolidated operating revenue

for the first quarter of 2016 of $1.120 billion, consolidated operating income of $13.4 million, and a net loss of $12 million. The financial metrics disclosed in the 1Q2016 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

142.    The 1Q2016 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K. Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

143.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 1Q2016 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

144.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

### M. YRC's Materially False and Misleading Statements in the 2Q2016 10-Q

145.    On July 28, 2016, the Individual Defendants caused the Company to file a Form 10-Q for 2Q 2016 (the "2Q2016 10-Q").  The Company reported consolidated operating revenue for the second quarter of 2016 of $1.208 billion, consolidated operating income of $57.2 million, and net income of $27.1 million.  The financial metrics disclosed in the 2Q2016 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

146.    The 2Q2016 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

147.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 2Q2016 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

148.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging

fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

### N. YRC's Materially False and Misleading Statements in the 3Q2016 10Q

149.    On October 27, 2016, the Individual Defendants caused the Company to file a Form 10-Q for 3Q 2016 (the "3Q2016 10-Q").  The Company reported consolidated operating revenue for the third quarter of 2016 of $1.221 billion, consolidated operating income of $38.8 million, and net income of $13.9 million.  The financial metrics disclosed in the 3Q2016 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

150.    The 3Q2016 10-Q included Sox Certifications signed by Defendants Welch and Pierson that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Welch's and Pierson's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

151.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 3Q2016 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

152.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**O. YRC's Materially False and Misleading Statements in the 2016 10-K**

153.    On February 17, 2017, the Individual Defendants caused the Company to file Form 10-K with the SEC (the "2016 10-K"), which made materially false and misleading statements and omitted material information.

154.    The 2016 10-K disclosed that the Company reported consolidated operating revenue for the year ended December 31, 2016 of $4.698 billion, consolidated operating income of $124.3 million, and net income of $21.5 million.

155.    The financial figures materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million.  For 4Q2015, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million.

156.    The 2016 10-K represented that:

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating. . . .

*Revenue Recognition and Revenue-related Reserves* . . . .

The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating.

157.    The above representations are materially false and misleading because the Individual Defendants failed to disclose that the Company's system blocked negative reweigh corrections and overcharged the Company's customers.   Additionally, the statement regarding "revenue earned" is materially false and misleading because the Company recorded at least $6 million per quarter in operating revenue from the overcharging fraud.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (*i.e.* prices) could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods. We accrue a reserve for rerating primarily based on historical trends.  At December 31, 2016 and 2015, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $10.4 million and $8.1 million, respectively. . .

*Revenue Recognition and Revenue-related Reserves*

At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts. Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods.  We accrue a reserve for rerating based primarily on historical trends.  At December 31, 2016 and 2015, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $10.4 million and $8.1 million, respectively.

158.    The above representation regarding the Company's rerating its customers' freight through "weight verifications" was materially false and misleading because the Individual Defendants failed to disclose that the Company was engaged in an overcharging fraud through reweighing.  When the customers were entitled to a refund or credit, the Company's system blocked negative reweigh corrections.  The Individual Defendants' failure to price the Company's customers' freight based on actual weights caused the "rerate reserve" to be materially understated in violation of GAAP.

159.    As to capturing, recording, and controlling information of the Company's revenue

reserves, the 2016 10-K stated:

***Revenue Recognition and Revenue-related Reserves . . . .***

We have an extensive system that allows us to accurately capture, record and
control all relevant information necessary to effectively manage our revenue
reserves. . . .

160.    This statement is materially false and misleading because the Individual Defendants

failed to disclose that the Company's system for recording information necessary to manage the

Company's revenue reserves did not "accurately record and control all relevant information

necessary" because the Company's system did not refund or credit its customers due to the

Company's overcharging fraud detailed above.

161.    The 2016 10-K included Sox Certifications signed by Defendants Welch and Fisher

that contained representations substantially similar to the representations contained in the 2013 10-

K.  Defendants Welch's and Fisher's representation that the Company has adequate internal

control over financial reporting was materially false and misleading because Defendants Welch

and Pierson failed to disclose that the Company executives designed a system that blocked

negative reweigh corrections and overcharging its customers, which resulted in approximately $6

million illicit revenue per quarter in violation of GAAP.

162.    As to legal proceedings, claims, and other litigation that the Company was involved

in, the 2016 10-K stated:

We are involved in other litigation or proceedings that arise in ordinary business
activities.  When possible, we insure against these risks to the extent we deem
prudent, but no assurance can be given that the nature or amount of such insurance
will be sufficient to fully indemnify us against liabilities arising out of pending and
future legal proceedings.  Many of these insurance policies contain self-insured
retentions in amounts we deem prudent.  Based on our current assessment of
information available as of the date of these financial statements, we believe that

our financial statements include adequate provisions for estimated costs and losses
that may be incurred within the litigation and proceedings to which we are a party.

163.    The above representations were materially false and misleading because the

Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging

fraud which began in 2009, which gave investors false impression that the Company did not face

substantial liability for violations of the FCA.

**P. YRC's Materially False and Misleading Statements in the 1Q2017 10-Q**

164.    On May 4, 2017, the Individual Defendants caused the Company to file a Form 10-

Q for 1Q 2017 (the "1Q2017 10-Q"). The Company reported consolidated operating revenue for

the first quarter of 2017 of $1.171 billion, a consolidated operating loss of $3.0 million, and a net

loss of $25.3 million. The financial metrics disclosed in the 1Q2017 10-Q were materially false

and misleading because the Company's operating revenue was overstated by $6 million from the

Company's overcharging fraud in violation of GAAP.

165.    The 1Q2017 10-Q included Sox Certifications signed by Defendants Welch and

Pierson that contained representations substantially similar to the representations contained in the

2013 10-K. Defendants Welch's and Pierson's representation that the Company has adequate

internal control over financial reporting was materially false and misleading because Defendants

Welch and Pierson failed to disclose that the Company executives designed a system that blocked

negative reweigh corrections and overcharging its customers, which resulted in approximately $6

million illicit revenue per quarter in violation of GAAP.

166.    As to legal proceedings, claims, and other litigation that the Company was involved

in, the 1Q2017 10-Q stated:

We are involved in other litigation or proceedings that arise in ordinary business
activities. When possible, we insure against these risks to the extent we deem
prudent, but no assurance can be given that the nature or amount of such insurance

will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

167. The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

### Q. YRC's Materially False and Misleading Statements in the 2Q2017 10-Q

168. On August 3, 2017, the Individual Defendants caused the Company to file a Form 10-Q for 2Q 2017 (the "2Q2017 10-Q"). The Company reported consolidated operating revenue for the second quarter of 2017 of $1.261 billion, consolidated operating income of $50 million, and net income of $19 million. The financial metrics disclosed in the 2Q2017 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

169. The 2Q2017 10-Q included Sox Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representations contained in the 2013 10-K. Defendants Welch's and Fisher's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

170. As to legal proceedings, claims, and other litigation that the Company was involved in, the 2Q2017 10-Q stated:

We are involved in other litigation or proceedings that arise in ordinary business activities. When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings. Many of these insurance policies contain self-insured retentions in amounts we deem prudent. Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

171. The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**R. YRC's Materially False and Misleading Statements in the 3Q2017 10-Q**

172. On November 2, 2017, the Individual Defendants caused the Company to file a Form 10-Q for 3Q 2017 (the "3Q2017 10-Q"). The Company reported consolidated operating revenue for the third quarter of 2017 of $1.251 billion, consolidated operating income of $40.1 million, and net income of $3 million. The financial metrics disclosed in the 3Q2017 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

173. The 3Q2017 10-Q included Sox Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representations contained in the 2013 10-K. Defendants Welch's and Fisher's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

174.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 3Q2017 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

175.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**T. YRC's Materially False and Misleading Statements in the 2017 10-K**

176.    On February 15, 2018, the Individual Defendants caused the Company to file Form 10-K with the SEC (the "2017 10-K"), which made materially false and misleading statements and omitted material information.

177.    The 2017 10-K disclosed that the Company reported consolidated operating revenue for the year ended December 31, 2017 of $4.9 billion in operating revenue, $98.4 in operating income, and a net loss of $10.8 million.

178.    The financial figures materially false and misleading because, in violation of GAAP, the Company's operating revenue was overstated by $24 million, operating income was overstated by $24 million.  For 4Q2015, the Company's operating revenue was overstated by $6 million, operating loss was understated by $6 million.

179.    The 2017 10-K represented that:

58

*Shipments in Transit*

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating. . . .

*Revenue Recognition and Revenue-related Reserves* . . . .

The total revenue earned is accumulated for all shipments in transit at a particular period end and recorded as operating revenue. . . .

We assign pricing to bills of lading at the time of shipment based primarily on the weight, general classification of the product, the shipping destination and individual customer discounts.  This process is referred to as rating.

180.    The above representations are materially false and misleading because the Individual Defendants failed to disclose that the Company's system blocked negative reweigh corrections and overcharged the Company's customers.  Additionally, the statement regarding "revenue earned" is materially false and misleading because the Company recorded at least $6 million per quarter in operating revenue from the overcharging fraud.

*Rerate Reserves*

At various points throughout our customer invoicing process, incorrect ratings (i.e. prices) could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods.  We accrue a reserve for rerating primarily based on historical trends.  At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively. . . .

*Revenue Recognition and Revenue-related Reserves* . . .

At various points throughout our process, incorrect ratings could be identified based on many factors, including weight verifications or updated customer discounts.  Although the majority of rerating occurs in the same month as the original rating, a portion occurs during the following periods.  We accrue a reserve for rerating based primarily on historical trends.  At December 31, 2017 and 2016, our financial statements included a rerate reserve as a reduction to "Accounts Receivable" of $8.8 million and $10.4 million, respectively.

181.    The above representation regarding the Company's rerating its customers' freight through "weight verifications" was materially false and misleading because the Individual Defendants failed to disclose that the Company was engaged in an overcharging fraud through reweighing.  When the customers were entitled to a refund or credit, the Company's system blocked negative reweigh corrections.  The Individual Defendants' failure to price the Company's customers' freight based on actual weights caused the "rerate reserve" to be materially understated in violation of GAAP.

182.    As to capturing, recording, and controlling information of the Company's revenue reserves, the 2017 10-K stated:

> ***Revenue Recognition and Revenue-related Reserves*** . . . .
>
> We have an extensive system that allows us to accurately capture, record and control all relevant information necessary to effectively manage our revenue reserves. . . .

183.    This statement is materially false and misleading because the Individual Defendants failed to disclose that the Company's system for recording information necessary to manage the Company's revenue reserves did not "accurately record and control all relevant information necessary" because the Company's system did not refund or credit its customers due to the Company's overcharging fraud detailed above.

184.    The 2017 10-K included Sox Certifications signed by Defendants Welch and Fisher that contained representations substantially similar to the representations contained in the 2013 10-K. Defendants Welch's and Fisher's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative

reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

185.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 2017 10-K stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

186.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

### U. YRC's Materially False and Misleading Statements in the 1Q2018 10-Q

187.    On May 3, 2018, the Individual Defendants caused the Company to file a Form 10-Q for 1Q 2018 (the "1Q2018 10-Q").  The Company reported consolidated operating revenue for the first quarter of 2018 of $1.2 billion, a consolidated operating loss of $4.3 million, and a net loss of $14.6 million.  The financial metrics disclosed in the 1Q2018 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

188.    The 1Q2018 10-Q included Sox Certifications signed by Defendants Hawkins and Fisher that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Hawkins' and Fisher's representation that the Company has adequate

internal control over financial reporting was materially false and misleading because Defendants

Welch and Pierson failed to disclose that the Company executives designed a system that blocked

negative reweigh corrections and overcharging its customers, which resulted in approximately $6

million illicit revenue per quarter in violation of GAAP.

189.    As to legal proceedings, claims, and other litigation that the Company was involved

in, the 1Q2018 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business
> activities.  When possible, we insure against these risks to the extent we deem
> prudent, but no assurance can be given that the nature or amount of such
> insurance will be sufficient to fully indemnify us against liabilities arising out of
> pending and future legal proceedings.  Many of these insurance policies contain
> self-insured retentions in amounts we deem prudent.  Based on our current
> assessment of information available as of the date of these financial statements,
> we believe that our financial statements include adequate provisions for
> estimated costs and losses that may be incurred within the litigation and
> proceedings to which we are a party.

190.    The above representations were materially false and misleading because the

Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging

fraud which began in 2009, which gave investors false impression that the Company did not face

substantial liability for violations of the FCA.

**V. YRC's Materially False and Misleading Statements in the 2Q2018 10-Q**

191.    On August 2, 2018, the Individual Defendants caused the Company to file a Form

10-Q for 2Q 2018 (the "2Q2018 10-Q").  The Company reported consolidated operating revenue

for the second quarter of 2018 of $1.326 billion, consolidated operating income of $50.9 million,

and net income of $14.4 million.  The financial metrics disclosed in the 2Q2018 10-Q were

materially false and misleading because the Company's operating revenue was overstated by $6

million from the Company's overcharging fraud in violation of GAAP.

192.    The 2Q2018 10-Q included Sox Certifications signed by Defendants Hawkins and Fisher that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Hawkins's and Fisher's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

193.    In a press release published on August 2, 2018 in connection with 2Q 2018 results, defendant Hawkins stated:

> During the second quarter we maintained our focus on improving yield and securing the right freight from our customers who value the service and capacity that Holland, New Penn, Reddaway and YRC Freight provide.  This strategy contributed to solid year-over-year increases in revenue per hundredweight and revenue per shipment that outpaced contractual cost increases.

194.    Defendant Hawkins's representations concerning the Company's strategy were materially false and misleading because he failed to disclose that the Company blocked negative reweigh corrections while YRC's competitors did not.  The fraudulent billing scheme brought illicit revenues to the Company at the expense of the Company's customers.

195.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 2Q2018 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

196.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**W. YRC's Materially False and Misleading Statements in the 3Q2018 10-Q**

197.    On November 1, 2018, the Individual Defendants caused the Company to file a Form 10-Q for 3Q 2018 (the "3Q2018 10-Q").  The Company reported consolidated operating revenue for the third quarter of 2018 of $1.304 billion, consolidated operating income of $41.2 million, and net income of $2.9 million.  The financial metrics disclosed in the 3Q2018 10-Q were materially false and misleading because the Company's operating revenue was overstated by $6 million from the Company's overcharging fraud in violation of GAAP.

198.    The 3Q2018 10-Q included Sox Certifications signed by Defendants Hawkins and Fisher that contained representations substantially similar to the representations contained in the 2013 10-K.  Defendants Hawkins's and Fisher's representation that the Company has adequate internal control over financial reporting was materially false and misleading because Defendants Welch and Pierson failed to disclose that the Company executives designed a system that blocked negative reweigh corrections and overcharging its customers, which resulted in approximately $6 million illicit revenue per quarter in violation of GAAP.

199.    In a press release published on November 1, 2018 in connection with 3Q 2018 results, the Company stated:

> "Pricing discipline and demand trends remained strong in third quarter with year-over-year growth in operating revenue, revenue per hundredweight and revenue per shipment statistics, both including and excluding fuel surcharge," stated Darren Hawkins, chief executive officer of YRC Worldwide.  "I am pleased with our focused discipline on growing yield and securing the right freight mix for our

networks, while balancing our capacity constraints, minimizing third-party costs for local purchased transportation and reducing short-term rentals."

200.    Defendant Hawkins's representations concerning the Company's pricing discipline and demand trends were materially false and misleading because he failed to disclose that the Company blocked negative reweigh corrections while YRC's competitors did not.  The fraudulent billing scheme brought illicit revenues to the Company at the expense of the Company's customers.

201.    As to legal proceedings, claims, and other litigation that the Company was involved in, the 3Q2018 10-Q stated:

> We are involved in other litigation or proceedings that arise in ordinary business activities.  When possible, we insure against these risks to the extent we deem prudent, but no assurance can be given that the nature or amount of such insurance will be sufficient to fully indemnify us against liabilities arising out of pending and future legal proceedings.  Many of these insurance policies contain self-insured retentions in amounts we deem prudent.  Based on our current assessment of information available as of the date of these financial statements, we believe that our financial statements include adequate provisions for estimated costs and losses that may be incurred within the litigation and proceedings to which we are a party.

202.    The above representations were materially false and misleading because the Individual Defendants failed to disclose the DOJ investigation over the Company's overcharging fraud which began in 2009, which gave investors false impression that the Company did not face substantial liability for violations of the FCA.

**THE TRUTH EMERGES**

203.    On December 14, 2018, the DOJ published a press release stating that it had filed a complaint against YRC entities for "systematically overcharge[ing] the government for freight carrier services and ma[king] false statements to the government that hid their misconduct[.]"

204.    On the same day, YRC published a press release regarding the DOJ's complaint, stating:

OVERLAND PARK, Kan., Dec. 14, 2018 (GLOBE NEWSWIRE) -- (NASDAQ: YRCW) -- After more than 9 years of diligently cooperating with the federal government's inquiries, YRC Freight was informed that the government filed a Complaint in Intervention related to the company's charges for shipments tendered to it for transport during a period prior to 2013.  Business with the U.S. Department of Defense currently represents less than one percent of YRC Freight's annual revenue.

"These claims are totally without merit," said Jim Fry, YRCW General Counsel. "We have made every effort over nearly a decade to address the government's questions.  We are confident that the evidence will demonstrate YRC Freight acted consistently with our contract and all applicable guidelines.  We look forward to continuing to provide essential and valuable logistics services to the U.S. government and all our customers."

205.    News outlets also covered the DOJ's complaint.  The *Wall Street Journal* reported that:

The Justice Department is suing a major U.S. freight carrier, alleging that trucking units of YRC Worldwide Inc. overcharged the Pentagon millions of dollars for shipping over several years.

The department said in the lawsuit filed earlier this week that YRC Freight Inc., Roadway Express Inc. and Yellow Transportation Inc. made false statements to the government and defrauded the Department of Defense by inflating weight measurements on bills.

For more than seven years, from 2005 to at least 2013, workers for the companies reweighed thousands of shipments and didn't disclose the results when those weights came in under the original estimate, the lawsuit alleges.

206.    On this news, YRC share prices fell 28% on the same day on heavier than average trading volume.

207.    On February 19, 2019, the Individual Defendants caused the Company to file Form 10-K for the year ended December 31, 2018, in which they disclosed:

**Commitments, Contingencies, and Uncertainties . . .**

***Department of Defense Complaint***

In December 2018, the United States on behalf of the United States Department of Defense filed a complaint against the Company in the U.S. District in the Western District of New York captioned *United States ex rel. James Hannum v. YRC Freight, Inc.; Roadway Express, Inc.; and Yellow Transportation, Inc.*, Civil Action No. 08-0811(A).  The complaint alleges that the Company violated the False Claims Act by overcharging the Department of Defense for freight carrier services by failing to comply with the contractual terms of freight contracts between the Department of Defense and the Company and related government procurement rules.  The complaint also alleges claims for unjust enrichment and breach of contract and seeks damages, treble damages, civil penalties, attorneys' fees and costs of suit, all in unspecified amounts, under the False Claims Act.  Management believes it has meritorious defenses and will vigorously defend this action.

*       *       *

Although the Company believes it has meritorious defenses and intends to vigorously defend [the Whistleblower Action] . . . , if resolved against us, could give rise to substantial damages, and an unfavorable outcome or settlement may result in a significant monetary judgment or award against us or a significant monetary payment by us, and could have a material adverse effect on our business, financial conditions and results of operations.

**THE DIRECTOR DEFENDANTS ISSUED A MATERIALLY FALSE AND MISLEADING PROXY STATEMENT DURING THE RELEVANT PERIOD.**

208.    In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.  The Director Defendants drafted, approved, reviewed, and/or signed the following proxy statements before it was filed with the SEC and disseminated to YRC's shareholders.  The Director Defendants negligently issued materially misleading statements in its proxy statements.  These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the following proxy allegations and related claims.

### A. The 2014 Proxy Contained Materially False and Misleading Statements

209.    The Company's Form DEF 14A filed on March 18, 2014 (the "2014 Proxy") sought stockholder votes to, among others, elect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Welch, and Weinstock nominated by the Company's Board of Directors to serve on the Board for a year.

210.    In support of defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Welch, and Weinstock bid to reelect themselves, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2014 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that YRC faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2014 Proxy stated:

**The Board's Role in Risk Management**

Management is primarily responsible for identifying, assessing and managing our material risk exposures.  The Board's role is to oversee the systems and processes used by management to address those risks.

Management's processes for identifying, assessing and managing material risk exposures are described in its strategic plan, which is updated by management and reviewed by the Board on an annual and periodic basis.

The Board has delegated specific risk oversight responsibilities to its standing committees as follows:

- the Governance Committee oversees our enterprise risk management process;

- the Audit & Ethics Committee oversees risks related to accounting and financial reporting matters and ethics and general compliance matters; and

- the Compensation Committee oversees risks related to compensation policies and practices.

Pursuant to its charter, the Governance Committee oversees management's systems and processes for the identification, assessment and management of material risk exposures.  These include:

- business and reputational risk;

- legal, regulatory and internal policy compliance risk;

- information technology, governance and security risk;

- corporate governance risk;

- claims, workers' compensation and accident risk;

- fraud risk;

- financial covenant compliance risk;

- disclosure risk;

- competitive and economic risk;

- credit, liquidity and going concern risk;

- profitability and margin risk;

- tax risk; and

- crisis management risk.

Management reports regularly to the Governance Committee on material risk exposures and its risk management approach, policies, systems and practices.  The Governance Committee evaluates management's risk appetite and the appropriateness of risks assumed and managed within that context.  The Governance Committee reports to the full Board on management's briefings and its own analysis and conclusions regarding our risk management process.  The Governance Committee discusses with our Audit & Ethics Committee our accounting and financial reporting risk profile, key risk exposures and the steps management has taken to monitor and control such exposures.

The Audit & Ethics Committee's oversight of risks related to accounting and financial reporting includes reviewing the adequacy of our overall control environment and financial reporting function and controls related to selected areas presenting significant financial risk.  The Audit & Ethics Committee also evaluates key financial statement issues and risks, their potential effect on our financial reporting, and the process used by management to address them.  The Audit &

Ethics Committee reports to the full Board its analyses and conclusions regarding our accounting and financial reporting risks.

211.    The 2014 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with YRC's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner.   In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from disclosing that:   (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with GAAP; and (3) the very existence of the DOJ Investigation.

212.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Welch, and Weinstock.

**B. The 2015 Proxy Contained Materially False and Misleading Statements**

213.    The Company's Form DEF 14A filed on March 17, 2015 (the "2015 Proxy") sought stockholder votes to, among others, elect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Welch, and Weinstock nominated by the Company's Board of Directors to serve on the Board for a year.

214.    In support of the Director Defendants' bid to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Welch, and Weinstock, the Director Defendants highlighted their supposed oversight of the Company.   In particular, the 2015 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that YRC faces, including legal

and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2015 Proxy stated:

**The Board's Role in Risk Management**

Management is primarily responsible for identifying, assessing and managing our material risk exposures.  The Board's role is to oversee the systems and processes used by management to address those risks.

Management's processes for identifying, assessing and managing material risk exposures are described in its strategic plan, which is updated by management and reviewed by the Board on an annual and periodic basis.

The Board has delegated specific risk oversight responsibilities to its standing committees as follows:

- the Governance Committee oversees our enterprise risk management process;

- the Audit & Ethics Committee oversees risks related to accounting and financial reporting matters and ethics and general compliance matters; and

- the Compensation Committee oversees risks related to compensation policies and practices.

Pursuant to its charter, the Governance Committee oversees management's systems and processes for the identification, assessment and management of material risk exposures.  These include:

- business and reputational risk;

- legal, regulatory and internal policy compliance risk;

- information technology, governance and security risk;

- corporate governance risk;

- claims, workers' compensation and accident risk;

- fraud risk;

- financial covenant compliance risk;

- disclosure risk;

- competitive and economic risk;

- credit, liquidity and going concern risk;

- profitability and margin risk;

- tax risk; and

- crisis management risk.

Management reports regularly to the Governance Committee on material risk exposures and its risk management approach, policies, systems and practices. The Governance Committee evaluates management's risk appetite and the appropriateness of risks assumed and managed within that context. The Governance Committee reports to the full Board on management's briefings and its own analysis and conclusions regarding our risk management process. The Governance Committee discusses with our Audit & Ethics Committee our accounting and financial reporting risk profile, key risk exposures and the steps management has taken to monitor and control such exposures.

The Audit & Ethics Committee's oversight of risks related to accounting and financial reporting includes reviewing the adequacy of our overall control environment and financial reporting function and controls related to selected areas presenting significant financial risk. The Audit & Ethics Committee also evaluates key financial statement issues and risks, their potential effect on our financial reporting, and the process used by management to address them. The Audit & Ethics Committee reports to the full Board its analyses and conclusions regarding our accounting and financial reporting risks.

215.    The 2015 Proxy, thus, assured stockholders that both the Director Defendants and the Board was involved with YRC's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from disclosing that: (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with GAAP; and (3) the very existence of the DOJ Investigation.

216.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Welch, and Weinstock.

**C. The 2016 Proxy Contained Materially False and Misleading Statements**

217.    The Company's Form DEF 14A filed on March 17, 2016 (the "2016 Proxy") sought stockholder votes to, among others, elect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock  nominated by the Company's Board of Directors to serve on the Board for a year.

218.    In support of the Director Defendants' bid to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2016 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that YRC faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2016 Proxy stated:

**The Board's Role in Risk Management**

Management is primarily responsible for identifying, assessing and managing our material risk exposures.  The Board's role is to oversee the systems and processes used by management to address those risks.

Management's processes for identifying, assessing and managing material risk exposures are described in its strategic plan, which is updated by management and reviewed by the Board on an annual and periodic basis.

The Board has delegated specific risk oversight responsibilities to its standing committees as follows:

- the Governance Committee oversees our enterprise risk management process;

- the Audit & Ethics Committee oversees risks related to accounting and financial reporting matters and ethics and general compliance matters; and

- the Compensation Committee oversees risks related to compensation policies and practices.

Pursuant to its charter, the Governance Committee oversees management's systems and processes for the identification, assessment and management of material risk exposures.  These include:

- business and reputational risk;
- legal, regulatory and internal policy compliance risk;
- information technology, governance and security risk;
- corporate governance risk;
- claims, workers' compensation and accident risk;
- fraud risk;
- financial covenant compliance risk;
- disclosure risk;
- competitive and economic risk;
- credit, liquidity and going concern risk;
- profitability and margin risk;
- tax risk; and
- crisis management risk.

Management reports regularly to the Governance Committee on material risk exposures and its risk management approach, policies, systems and practices.  The Governance Committee evaluates management's risk appetite and the appropriateness of risks assumed and managed within that context.  The Governance Committee reports to the full Board on management's briefings and its own analysis and conclusions regarding our risk management process.  The Governance Committee discusses with our Audit & Ethics Committee our accounting and financial reporting risk profile, key risk exposures and the steps management has taken to monitor and control such exposures.

The Audit & Ethics Committee's oversight of risks related to accounting and financial reporting includes reviewing the adequacy of our overall control environment and financial reporting function and controls related to selected areas presenting significant financial risk.  The Audit & Ethics Committee also evaluates key financial statement issues and risks, their potential effect on our financial reporting, and the process used by management to address them.  The Audit & Ethics Committee reports to the full Board its analyses and conclusions regarding our accounting and financial reporting risks.

219.    The 2016 Proxy, thus, assured stockholders that both the Director Defendants and

the Board was involved with YRC's business strategy, actively monitored the Company's risks

and exposures, following good corporate governance practices and acting in an ethical and legal

manner.  In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from disclosing that:  (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with GAAP; and (3) the very existence of the DOJ Investigation.

220.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock.

**D. The 2017 Proxy Contained Materially False and Misleading Statements**

221.    The Company's Form DEF 14A filed on March 21, 2017 (the "2017 Proxy") sought stockholder votes to, among others, elect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock nominated by the Company's Board of Directors to serve on the Board for a year.

222.    In support of the Director Defendants' bid to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2016 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that YRC faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2016 Proxy stated:

> **The Board's Role in Risk Management**
>
> Management is primarily responsible for identifying, assessing and managing our material risk exposures.  The Board's role is to oversee the systems and processes used by management to address those risks.

Management's processes for identifying, assessing and managing material risk exposures are described in its strategic plan, which is updated by management and reviewed by the Board on an annual and periodic basis.

The Board has delegated specific risk oversight responsibilities to its standing committees as follows:

- the Governance Committee oversees our enterprise risk management process;

- the Audit & Ethics Committee oversees risks related to accounting and financial reporting matters and ethics and general compliance matters; and

- the Compensation Committee oversees risks related to compensation policies and practices.

Pursuant to its charter, the Governance Committee oversees management's systems and processes for the identification, assessment and management of material risk exposures.  These include:

- business and reputational risk;
- legal, regulatory and internal policy compliance risk;
- information technology, governance and security risk;
- corporate governance risk;
- claims, workers' compensation and accident risk;
- fraud risk;
- financial covenant compliance risk;
- disclosure risk;
- competitive and economic risk;
- credit, liquidity and going concern risk;
- profitability and margin risk;
- tax risk; and
- crisis management risk.

Management reports regularly to the Governance Committee on material risk exposures and its risk management approach, policies, systems and practices.  The Governance Committee evaluates management's risk appetite and the appropriateness of risks assumed and managed within that context.    The Governance Committee reports to the full Board on management's briefings and its own analysis and conclusions regarding our risk management process.    The Governance Committee discusses with our Audit & Ethics Committee our accounting and financial reporting risk profile, key risk exposures and the steps management has taken to monitor and control such exposures.

The Audit & Ethics Committee's oversight of risks related to accounting and financial reporting includes reviewing the adequacy of our overall control

environment and financial reporting function and controls related to selected areas presenting significant financial risk. The Audit & Ethics Committee also evaluates key financial statement issues and risks, their potential effect on our financial reporting, and the process used by management to address them. The Audit & Ethics Committee reports to the full Board its analyses and conclusions regarding our accounting and financial reporting risks.

223. The 2017 Proxy, thus, assured stockholders that both the Director Defendants and the Board was involved with YRC's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from disclosing that: (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with GAAP; and (3) the very existence of the DOJ Investigation.

224. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock.

**E. The 2018 Proxy Contained Materially False and Misleading Statements**

225. The Company's Form DEF 14A filed on March 19, 2018 (the "2018 Proxy") sought stockholder votes to, among others, elect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock nominated by the Company's Board of Directors to serve on the Board for a year.

226. In support of the Director Defendants' bid to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock, the Director Defendants highlighted their supposed oversight of the Company. In particular, the 2018 Proxy assured

stockholders that the Board and its committees regularly assess and manage the risks that YRC

faces, including legal and regulatory risks, financial controls, and risks associated with

compensation programs and plans.  The 2018 Proxy stated:

**The Board's Role in Risk Management**

Management is primarily responsible for identifying, assessing and managing our
material risk exposures.  The Board's role is to oversee the systems and processes
used by management to address those risks.

Management's processes for identifying, assessing and managing material risk
exposures are described in its strategic plan, which is updated by management and
reviewed by the Board on an annual and periodic basis.

The Board has delegated specific risk oversight responsibilities to its standing
committees as follows:

- the Governance Committee oversees our enterprise risk management
  process;

- the Audit & Ethics Committee oversees risks related to accounting and
  financial reporting matters and ethics and general compliance matters;
  and

- the Compensation Committee oversees risks related to compensation
  policies and practices.

Pursuant to its charter, the Governance Committee oversees management's
systems and processes for the identification, assessment and management of
material risk exposures.  These include:

- business and reputational risk;
- legal, regulatory and internal policy compliance risk;
- information technology, governance and security risk;
- corporate governance risk;
- claims, workers' compensation and accident risk;
- fraud risk;
- financial covenant compliance risk;
- disclosure risk;
- competitive and economic risk;
- credit, liquidity and going concern risk;
- profitability and margin risk;
- tax risk; and
- crisis management risk.

Management reports regularly to the Governance Committee on material risk exposures and its risk management approach, policies, systems and practices. The Governance Committee evaluates management's risk appetite and the appropriateness of risks assumed and managed within that context. The Governance Committee reports to the full Board on management's briefings and its own analysis and conclusions regarding our risk management process. The Governance Committee discusses with our Audit & Ethics Committee our accounting and financial reporting risk profile, key risk exposures and the steps management has taken to monitor and control such exposures.

The Audit & Ethics Committee's oversight of risks related to accounting and financial reporting includes reviewing the adequacy of our overall control environment and financial reporting function and controls related to selected areas presenting significant financial risk. The Audit & Ethics Committee also evaluates key financial statement issues and risks, their potential effect on our financial reporting, and the process used by management to address them. The Audit & Ethics Committee reports to the full Board its analyses and conclusions regarding our accounting and financial reporting risks.

227. The 2018 Proxy, thus, assured stockholders that both the Director Defendants and the Board was involved with YRC's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Individual Defendants from disclosing that: (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with GAAP; and (3) the very existence of the DOJ Investigation.

228. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Welch, and Winestock.

79

**THE INDIVIDUAL DEFENDANTS SOLD SUBSTANTIAL SHARES OF YRC STOCK WHILE IN POSSESSION OF MATERIAL, ADVERSE INFORMATION REGARDING THE COMPANY'S BUSINESS.**

229.    During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of YRC common stock while in possession of material information that was adverse to YRC's business.

230.    In particular, the Insider Selling Defendants sold a total of more than $10 million in YRC common stock during the Relevant Period.

231.    In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

232.    As a result of the Individual Defendants' wrongful conduct, YRC disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated YRC's credibility. YRC has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

233.    Moreover, the actions of the Individual Defendants in directing YRC to undertake illicit overcharging practices have exposed YRC to civil and criminal liability and are not protected by the business judgment rule.

234.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action in addition to potential fines from the U.S. regulators regarding the Company's illicit overcharging practices.

235.    As a direct and proximate result of the Individual Defendants' actions as alleged above, YRC's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

236.    Moreover, these actions have irreparably damaged YRC's corporate image and goodwill.  For at least the foreseeable future, YRC will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that YRC's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

237.    Plaintiff incorporates the allegations herein by reference.

238.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

239.    Plaintiff is a stockholder of YRC, was a stockholder of YRC at the time of the wrongdoing alleged herein, and has been a stockholder of YRC continuously since that time.

240.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

241.    As a result of the facts set forth herein, Plaintiff has not made any demand on the YRC Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

242.   At the time of the filing of this complaint, the YRC Board consists of the following six individuals:  Defendants Bromark, Carty, Davidson, Doheny, Friedman, Hawkins, Hoffman, Nazemetz, and Winestock.

243.   As a result of the facts set forth herein, Plaintiff has not made any demand on the YRC Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current Board members because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL CURRENT MEMBERS OF THE BOARD BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

244.   The current members of the Board all face a substantial likelihood of liability for their individual misconduct.  The current members of the Board were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

245.   Moreover, as directors, the current members of the Board owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard allowed YRC to partake in illicit sales practices and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

246.    The current members of the Board knowingly and/or recklessly allowed YRC to partake in illicit overcharging practices, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.   These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability.   If the current members of the Board were to bring a suit on behalf of YRC to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.   This is something they will not do.   For this reason, demand is futile as to the Director Defendants.

**DEMAND IS EXCUSED AS DEFENDANTS HAWKINS, WELCH, PIERSON, FISHER, BROMARK, AND DAVIDSON BECAUSE THEY FINANCIALLY BENEFITED FROM THE FALSE AND MISLEADING STATEMENTS**

247.    As noted above, the Insider Selling Defendants personally benefited from YRC's illicit overcharging practices and the materially false and misleading statements made by the Individual Defendants by having an opportunity to sell shares of YRC stock at artificially inflated prices, a benefit not shared by YRC's public stockholders.   Accordingly, demand is futile as to defendants Hawkins, Welch, Pierson, Fisher, Bromark, and Davidson.

**DEFENDANT HAWKINS IS INTERESTED AND LACKS INDEPENDENCE**

248.    Defendant Hawkins is not disinterested for purposes of demand futility because his principal occupation is serving as YRC's CEO.   As such, the 2018 Proxy filed with the SEC explicitly states that Hawkins is not independent.   Further, according to the Company's SEC filings, in 2018, Hawkins received total compensation of $4,425,681.   This amount is material to him.

249.    Further, Hawkins is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**DEFENDANT DOHENY IS INTERESTED AND LACKS INDEPENDENCE**

250.    Defendant Doheny is not independent for purposes of demand futility because he received substantial pecuniary benefit from several numerous YRC employees, including several of the defendants named herein, as well as numerous members of the Board.  The amount received was material to Doheny, especially in the context of what campaign finance laws permit, and the fact that various YRC-affiliated individuals donated such substantial sums indicates that Doheny is dependent upon those individuals for financial support.

**DEMAND IS EXCUSED AS TO DEFENDANTS BROMARK, CARTY, AND FRIEDMAN BECAUSE AS MEMBERS OF THE AUDIT & ETHICS COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

251.    As members of the Audit & Ethics Committee during the Relevant Period, defendants Bromark, Carty, and Friedman participated in and knowingly approved YRC's illicit overcharging practices and filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit & Ethics Committee, defendants Bromark, Carty, and Friedman were obligated to oversee and monitor the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements.  Instead, defendants Bromark, Carty, and Friedman, as members of the Audit & Ethics Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter.  For this reason, demand is futile as to defendants Bromark, Carty, and Friedman.

**DEMAND IS EXCUSED AS TO DEFENDANTS KNEELAND, NAZEMETZ, AND WINESTOCK BECAUSE AS MEMBERS OF THE GOVERNANCE COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

252.    As members of the Governance Committee during the Relevant Period, defendants Kneeland, Nazemetz, and Winestock participated in and knowingly approved YRC's illicit overcharging practices and filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Governance Committee, defendants Kneeland, Nazemetz, and Winestock were obligated to oversee Company's enterprise risk.  Instead, defendants Kneeland, Nazemetz, and Winestock, as members of the Governance Committee, failed to manage the Company's enterprise risk, as required by the Governance Committee Charter.  For this reason, demand is futile as to defendants Kneeland, Nazemetz, and Winestock.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

253.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of YRC's business and affairs.

255.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

256.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The

Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of YRC.

257.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

258.   The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the illicit sales practices in violation of U.S. law.

259.   In addition, the Individual Defendants further breached their fiduciary duties owed to YRC by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was materially inflating YRC's reported revenue, earnings and the value of its publicly-traded securities; (2) the Company's reported financials were not prepared in conformity with Generally Accepted Accounting Practices ("GAAP"); and (3) a DOJ Investigation had been initiated.   As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

260.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

261.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

262.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

263.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, YRC has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

264.     Plaintiff on behalf of YRC has no adequate remedy at law.

## COUNT II

### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
### (Against the Director Defendants)

265.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

266.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

267.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2014 Proxy, the 2015 Proxy, the 2016 Proxy, the 2017 Proxy, and the 2018 Proxy.  In these proxy statements, the Board solicited stockholder votes to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Winestock, and Welch to the Board.

268.    The proxy statements, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, YRC misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Winestock, and Welch to the Board.

269.    Plaintiff, on behalf of YRC, thereby seeks relief for damages inflicted upon the Company based upon the misleading proxy statements in connection with the improper reelection of defendants Bromark, Doheny, Friedman, Hoffman, Kneeland, Nazemetz, Winestock, and Welch to the Board.

## COUNT III

### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
### (Against the Insider Selling Defendants)

270.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

271.     At the time each of the Insider Selling Defendants sold his or her YRC stock, he or she knew the material, non-public information described above, and sold YRC stock on the basis of such information.

272.     The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in YRC stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of YRC stock.

273.     The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to YRC for insider trading.

274.     Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

275.     Plaintiff, on behalf of YRC, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of YRC and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Ordering the Insider Selling Defendants to disgorge the profits obtained as a result of their sale of YRC stock while in possession of insider information as described herein;

D.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 15, 2019                    Respectfully Submitted,

*/s/ Blake A. Bennett*
**COOCH AND TAYLOR, P.A.**
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorney for Plaintiff*

**OF COUNSEL**
**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5858

*Attorneys for Plaintiff*